# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

JOHN DAVIS,

                Plaintiff,

    v.

                            **MEMORANDUM OF**
                            **LAW AND ORDER**
                            Civil File No. 21-1372 (MJD/TNL)

CORELOGIC PLATINUM VALUATION
SERVICES, LLC,

                Defendant.

---

William Christopher Penwell, Siegel Brill, PA, Counsel for Plaintiff.

Holly M. Robbins and Charles Urena, Littler Mendelson , PC  and Sinloria Macrae, Meagher & Greer, PLLP, Counsel for Defendant.

---

## I.    INTRODUCTION

Plaintiff John Davis was 57-years-old in November 2020 when he resigned from his job as a residential real estate appraiser for Defendant CoreLogic Platinum Valuation Systems.  Davis resigned because he was being assigned fewer appraisals than another appraiser who was 14-years-younger than he is. Davis sued CoreLogic for age discrimination, claiming he was constructively discharged.

1

As discussed more fully below, Davis was not constructively discharged. The imbalance in appraisals between Davis and his younger co-worker was caused by a mistake: an unintentional permanent increase to the other appraiser's daily appraisal "capacity" setting made in April 2020. Although the reason for the higher capacity setting turned out to be different from what Davis's managers originally assumed, neither reason was discriminatory.

Davis failed to demonstrate that the imbalance of appraisal assignments at CoreLogic was such that a reasonable person in his situation would find the working conditions intolerable or that CoreLogic deliberately rendered the conditions intolerable so as to force him to quit. Accordingly, Davis did not establish a prima facie case of age discrimination. CoreLogic's Motion for Summary Judgment is granted.

## II.   BACKGROUND

Plaintiff John Davis has filed a claim for age discrimination under the Minnesota Human Rights Act ("MHRA"). (Compl. ¶¶ 24-30.) Most relevant events occurred in 2020. Thus, for the most part, the year will not be included in dates unless dates refer to a year other than 2020.

### A.    Davis's Employment with CoreLogic

Defendant CoreLogic maintains a real estate appraising arm in

Minneapolis, Minnesota.  CoreLogic is a national company without hierarchy in

each location and Plaintiff Davis has never had a manager located in Minnesota.

Before he quit his job, Davis had worked as a residential appraiser for

CoreLogic or CoreLogic-related entities since December 2006 and was assigned

to Minneapolis-Saint Paul and the surrounding metropolitan area.  (Doc. 31 at 4

(Davis Dep. at 28-29).)  On average, Davis did 30-to-40 appraisals a month, which

made him either the highest or one of the highest producers in the company.  (Id.

at 4-5 (Davis Dep. at 29-30).)  In September 2020, he reported to Appraiser

Manager Michael McKinney; McKinney reported to Scott Nicholson, Senior

Leader of Valuation Production.  (Doc. 33 at 13 (Nicholson Dep. at 6-9).)

Davis also served as his district representative on the Appraiser Advisory

Council with Clay Vescera, who was then Regional Manager of the West Region

and managed staff appraisers.  (Id. at 3 (Vescera Dep. at 5); Doc. 31 at 24 (Davis

Dep. at 220).)  The Appraiser Advisory Council allowed representatives to raise

various issues that affected staff appraisers.  (Doc. 31 at 15-16 (Davis Dep. at 112,

123-24).)  Vescera managed staff appraisers in the West region, which likely did

3

not include the Twin Cities area.  (Doc. 33 at 4  (Vescera Dep. at 6-7).)  Vescera

did not assign appraisals.  (Id. (Vescera Dep. at 7).)

In spring 2019, CoreLogic lost Wells Fargo, one of Davis's biggest clients,

as a customer.  (Doc. 31 at 5 (Davis Dep. at 31).)  The loss of Wells Fargo and the

Covid-19 pandemic resulted in a significant decline in appraisal volume in

Davis's market.  (Id. at 20 (Davis Dep. at 141).)  For example, CoreLogic's staff

appraisers completed 4,543 orders in Minnesota in 2018; 2,996 orders in 2019; and

615 orders in 2020. (Doc. 37 at 19 (Def. Answer to Pl. Interrog. No. 5).)  As a result

of the drop in volume, CoreLogic reduced the number of appraisers it employed

in the Twin Cities metropolitan area from approximately 18 to two: Davis and

Callie Saumweber—who was 43-years-old in fall 2020—plus a trainee.  (Doc. 31

at 7 (Davis Dep. at 48); Doc. 26 (Nicholson Decl.) ¶ 9 (stating the reduction in

force ("RIF") reduced the number of fulltime appraisers from 14 to two).)

Saumweber's and Davis's areas overlapped but were not identical.  (Doc. 37 at 19

(Def. Answer to Pl. Interrog. No. 5).)  Remaining employees received a raise in

base pay.  (Doc. 31 at 20 (Davis Dep. at 141); Doc. 33 at 23 (Nicholson Dep. at 53).)

Beginning in October 2018, Saumweber was responsible for a trainee

appraiser named Zak Rexford and was paid an incentive bonus of $1200-per-

month for assuming this role.  (Doc. 37 at 20-21 (Def. Answers to Pl. Interrog.

Nos. 9-10; Doc. 33 at 28 (Nicholson 30(b)(6) Dep. at 26-27).)  In this teaching and

supervising role, Saumweber took Rexford to all her assignments and reviewed

all of Rexford's assignments.  (See Doc. 33 at 10 (Vescera Dep. at 31).)  When

Rexford became a fully-certified appraiser on September 24, 2020, Saumweber

was no longer his supervisor.  (Id. at 19 (Nicholson Dep. at 34).)  It appears that

Rexford performed no appraisals from September 24 to December 18, 2020.  (Id.

at 27 (Nicholson 30(b)(6) Dep. at 17).)

Despite the loss of Wells Fargo business, Davis's appraisals were not down

much in 2019.  (Doc. 46 at 16 (Davis Dep. at 49).)  However, Davis noticed a

"substantial" drop in workflow in August 2020.  (Id. at 10 (Davis Dep. at 42).)

McKinney became Davis's and Saumweber's district manager in August

2020 and began sending "Pipeline Reports" that showed the number of appraisal

assignments each appraiser received.  (Id. at 26 (Davis Dep. at 205); Doc. 44.)

Although appraisers were only identified by numbers, Davis used the reports to

determine that Saumweber was receiving more assignments than he was for the

months of September to November.  (Doc. 46 at 5-6 (Davis Dep. at 31-32); Doc. 43

(Davis Decl. ¶ 2).)

In 2020, the number of appraisal assignments continued to decline for all residential appraisers and Davis shared concerns with Vescera during meetings of the Appraiser Council.  (Doc. 31 at 15 (Davis Dep. at 112).)  On September 25, Davis reached out to Vescera via email about the lack of assignments:

> I just wanted to thank you for taking up the lack of work and new business generation issues. I can tell you this is subject #1 for Minnesota, as well as, every former District #7 appraiser that I have spoken with . . . . for many, the lack of workflow is an urgent situation. Personally, I have had no orders in 2 weeks.  In Minnesota, we have actually lost clients since losing Wells Fargo (including good client: Thrivent Federal Credit Union) and the Bank of America Work we do receive is distant and/or very unusual.  Please let me know if there is anything I can do to facilitate client generation.

(Doc. 36 at 70.)

Although Vescera was not Davis's manager, he acknowledged in a September 26 email that this was "one of the big issues," and that "not getting an order in two weeks is downright scary."  (Id. at 69.)  Vescera stated he wanted "to do a deep dive into volume in your particular market."  (Id.)  That meant he would "look[ ] into [Davis's] profile and look[ ] into his coverage in his market" because looking at whether particular zip codes were not getting work and other particulars were ways to detect if something was wrong.  (Doc. 33 at 5-6 (Vescera Dep. at 13-14).)  Due to competing priorities on his own team, the deep dive was

6

delayed and HR had to prompt him to complete it on November 18.  (Id. at 6-7 (Vescera Dep. at 14, 18-19).)

While Davis reported on September 25 that he had not received an order for two weeks, this is not true.  Davis was assigned two appraisals on September 10 and one on each of the following days: September 11, 14, and 22, although he may not have completed these assignments in September. (Doc. 53-1 at 2 (showing the appraisal assigned Sept. 22 was not completed until Oct. 9); see also Id. at 2, 4 (showing appraisals Davis was assigned later in Sept. and in Oct. that were completed in Oct. and Nov.)  Davis was also assigned an appraisal September 16 that was cancelled the same day.  (Id. at 2.)

At some point in time, Davis's immediate manager, McKinney, observed that Davis had received no commission for September.  (Doc. 46 at 7-8 (Davis Dep. at 39-40).)  Davis discovered via a CoreLogic pipeline report that Saumweber received appraisals during the two-week period when he had told Vescera he received none.  (Id. at 17 (Davis Dep. at 51).)

Davis never talked to McKinney about why Saumweber was getting more assignments than he was.  (Doc. 31 at 17 (Davis Dep. at 129).)  However, he "constantly" talked to McKinney about rectifying his low commissions (Doc. 46

at 8-9 (Davis Dep. at 40-41).)  Davis testified that he and McKinney had a good

working relationship and that although McKinney noted he had no commissions

for one month, Davis did not broach the subject about how to fix the issue with

McKinney.  (Id. at 8-10 (Davis Dep. at 40-42).)  Davis testified that McKinney

"was quite obviously aware that I was not, you know, getting any work for large

chunks of time."  (Id. at 9 (Davis Dep. at 41).)  Davis did not mention

discrimination to McKinney or that he felt he had to quit his job.

Davis began interviewing with his current employer, Amrock, LLC, in or

about October.  (Doc. 33 at 22 (Davis Dep. at 159-60);  Doc. 37 at 3-5 (email

messages between Davis and Colin Andree of Amrock).)  Davis received an

employment offer from Amrock on November 13.  (Doc. 37 at 9-11 (offer letter).)

Despite interviewing in October and receiving an offer on November 13,

Davis testified that he was not planning to leave CoreLogic and did not accept

the Amrock offer until after he gave notice on November 20.  (Doc. 46 at 23-24, 27

(Davis Dep. at 188-89, 211).)

On November 18, Davis had a Zoom call with Jeanette Bullocks, principal

of Employee Relations in the Human Resources Department.  (Doc. 31 at 17, 19

(Davis Dep. at 128, 134).)  Davis told Bullocks that he believed another appraiser

was receiving more assignments than him and was unsure if it was a "manager issue or not." (Id. at 17 (Davis Dep. at 129).)   Davis said he thought a "younger" person was receiving more assignments but did not mention discrimination.  (Id. (Davis Dep. at 128-29).)  He also did not mention his new job offer.

Davis testified that he did not raise the issue with McKinney, because he was uncertain if it was "something [McKinney] was doing intentionally . . . I just kind of lost faith in the system at that point."  (Id. (Davis Dep. at 129).)  On November 18, Davis forwarded his Vescera email communications to Bullocks. (Doc. 36 at 69-70.)  Davis also volunteered to be laid off and "indicated that perhaps he was already slated to be terminated."  (Doc. 46-4 at 4 (Pl. Answer to Def. Interrog. No. 9);  Doc. 46 at 20 (Davis Dep. at 145).)

Bullocks contacted Nicholson the day of the Zoom call to tell him about Davis's concerns regarding the number of assignments he was receiving.  (Doc. 33 at 16-17 (Nicholson Dep. at 19, 22-23).)  She also contacted Vescera and directed him and Nicholson to complete the "deep dive" Vescera had delayed. (Id. at 5-6, 8-9 (Vescera Dep. at 13-14, 24-26).)  Nicholson participated because he was the regional manager who managed McKinney while McKinney managed Davis.  (Id. at 9 (Vescera Dep. at 25-26).)  Although Vescera testified that "HR . . .

prompted me to make sure I got [the deep dive] done and [to] work with Scott

[Nicholson] to get that done," Nicholson did not recall whether he and Vescera

worked on it together or if he did it alone.  (Id. at 8 (Vescera Dep. at 25), 17

(Nicholson Dep. at 24).)  Bullocks emailed Davis the next day, November 19:

> Thank you for meeting with me yesterday to discuss your
> workplace concerns.
>
> Just wanted to let you know that I had the opportunity to discuss
> your concerns.
>
> 1.  low appraisal volumes
> 2.  peer in service market receiving steady appraisals to complete
> 3.  lack of commission payments over the past 5-6 months
> 4.  Request for voluntary layoff with your leadership team.
>
> They are reviewing your concerns and request and will need some
> time for investigation.
>
> With next week being a company shut down period for the
> Thanksgiving holiday, I anticipate having an update around the
> beginning of December.

(Doc. 36 at 76 (punctuation and capitalization in original).)

On November 20, Davis informed Bullocks he was resigning from

CoreLogic because he only had five assignments in November and he and his

wife could not "financially endure" another month without enough work to

generate commissions.  (Id. at 75 (Davis resignation email).)

Bullocks promised to share the results of the investigation with him.  (Id. (Bullocks reply to Davis).)  Later that day, Davis gave McKinney his two-weeks notice.  (Id. at 88.)  McKinney was sorry to hear the news and wished Davis the best in the future.  (Id.)  After Davis gave his notice, McKinney left Davis "a couple of voicemails" Davis believes indicated McKinney was upset Davis was leaving.  (Doc. 31 at 21 (Davis Dep. at 155-56).)  Based on the voicemails, Davis did not believe McKinney was trying to "push him out."  Davis has "no knowledge" that McKinney was involved in the assignment imbalance that led him to quit.  (Id. (Davis Dep. at 156).)  After Davis quit, the only appraisers left covering Davis's area were Saumweber and Rexford, who are 14 and 24 years younger than Davis.  (Doc. 43 (Davis Decl. ¶ 7).)

CoreLogic's real estate appraisal business continued to decrease after Davis resigned.  (Doc. 26 (Nicholson Decl. ¶ 16).)  Saumweber and Rexford left CoreLogic in May and September 2021, both because of lack of appraisal assignments and commission income.  (Id. ¶¶ 17-18 (citing Doc. 26-1 at 2 (Saumweber resignation email)).)

**B.     CoreLogic's Usual Assignment Process and Compensation Structure**

CoreLogic relies on two types of appraisers:  staff appraisers such as Davis, who are W-2 employees of CoreLogic, and fee appraisers, who are not W-2 employees.  (Doc. 33 at 3 (Vescera Dep. at 5).)  Typically, staff appraisers receive projects via CoreLogic's national automated system, CoreLogic Collateral Connection ("CCC").  (Id. at 4 (Vescera Dep. at 7), 14 (Nicholson Dep. at 13).) CCC analyzes appraiser eligibility for assignments based on criteria such as the geographic area of the assignment, location of the appraiser, "capacity" of the appraiser, client preference, and others.  (Id. at 14-15 (Nicholson Dep. at 13-14).)

Each appraiser is assigned a "daily capacity" and an "overall capacity." Daily capacity reflects the number of assignments an appraiser can receive per day; overall capacity reflects the total orders an appraiser can carry in their backlog.  (Id. at 4 (Vescera Dep. at 8).)  After determining appraiser eligibility, CCC applies other sorting criteria, favoring staff appraisers over fee appraisers. (Id. at 15 (Nicholson Dep. at 15-16).)  Once an appraiser's capacity setting is set, it stays on that setting until someone changes it.  (See id. at 6 (Vescera Dep. at 17).)

Appraisers receive a base wage whether they meet their commission goals or not.  (Nicholson Decl. ¶ 13).)  Only after an appraiser's billings reach a

minimum threshold does the appraiser receive commissions for additional billings.  (Id.)  If an appraiser's billings do not reach the minimum for a particular month, the appraiser receives no commissions for that month.  (Id. )

### C.    Manual Adjustments in Appraisal Assignments

In limited circumstances, managers and members of the CoreLogic operations team are able to manually adjust capacity settings to determine appraisers' eligibility for specific assignments.  (Id. ¶ 7.)  For example, if the CCC system reflects that an appraiser has been assigned their full daily capacity, a manager may take manual steps to increase capacity on a single occasion if the appraiser needs to conduct a particular appraisal.  (Id.)  Capacity should be readjusted back to the original setting immediately after the assignment is made. (Id. ¶¶  7-8.)  This process occurs "with some regularity."  (Doc. 33 at 20 (Nicholson Dep. at 41).)

### D.    CoreLogic's Deep Dive into Davis's Complaint

Nicholson's and Vescera's "deep dive" investigation began with a review of both Davis's and Saumweber's CCC profiles, capacity numbers, and Davis's coverage area to determine if there was a reason for the disparity in assignments. (Id. at 6 (Vescera Dep. at 14-15), 17 (Nicholson Dep. at 23, 25).)  Nicholson and Vescera realized on November 18 that at some point Saumweber's daily capacity

had been adjusted upwards, while Davis's daily capacity remained the same. (Id. at 6 (Vescera Dep. at 16), 20 (Nicholson Dep. at 38-39).)  This resulted in the CCC always giving Saumweber assignments before Davis because of her higher remaining capacity, the overlap in their markets, and because their market experienced such a steep decline in assignments during 2020, even if there was only one assignment for the day.  (Id. at 6 (Vescera Dep. at 15-16).)

As soon as Nicholson realized what happened, he told McKinney to equalize Davis's and Saumweber's daily capacity settings.  McKinney did so immediately.  (Id. at 17 (Nicholson Dep. at 23-24).)  However, no one told Davis McKinney had made these changes.  (Doc. 43 (Davis Decl. ¶¶ 5-6).)

Because Davis had already resigned, Nicholson did not do a forensic review to determine why Saumweber's capacity had been set higher.  Rather, he guessed that Saumweber had increased capacity because she had a trainee and that her capacity was not properly readjusted on September 24 when Rexford was no longer a trainee.  (Doc. 33 at 21 (Nicholson Dep. at 42-43).)

On December 18, Bullocks sent Davis an email stating the following:

On November 18, 2020, you and I spoke regarding concerns you had with the work volumes, as listed below:

1.  low appraisal volumes

14

2. peer in service market receiving steady appraisals to complete

3. lack of commission payments over the past 5-6 months

4. Request for voluntary layoff with your leadership team.

I was able to review your concerns with the Appraisal management team to understand the appraisal volumes and how the appraisal work is assigned.

.   .   .

You mentioned that a peer in the market was receiving steady work volumes. If you compare the volumes from 2019 to 2020, there was definitely a decline in volumes in your market that impacted all Appraisers that serviced the area, not just you. In addition, the female peer that you referenced was a supervisor of an appraiser trainee. As a result, she had an adjusted capacity to account for the trainee hours needed to meet licensure requirements. I didn't see that she was given more orders because of her age or gender, as you mentioned in our discussion on November 18, 2020.

You initially requested the voluntary layoff but later submitted your voluntary resignation.

(Doc. 36 at 73.)

In March 2022, in preparation for his deposition for this case, Nicholson again looked at Davis's and Saumweber's assignments from November 2020. (Doc. 33 at 21 (Nicholson Dep. at 44).) He discovered that in April 2020, Saumweber's capacity was manually adjusted by a member of the operations team so that a specific appraisal could be assigned to her but that a readjustment

back was never made.  (Id. at 20-21 (Nicholson Dep. at 40-43).)[1]  It should have

been made immediately and was not.  (Id. at 21 (Nicholson Dep. at 42).)  He also

learned there is no policy at CoreLogic to increase the capacity of appraiser

training supervisors as Nicholson had assumed in November 2020.  (Id.

(Nicholson Dep. at 42-43); Doc. 46-1 at 16 (Nicholson Dep. at 54).)

From June to November 2020, Davis completed 88 appraisals; Saumweber

completed 155 appraisals.  (Doc. 27 at 24.) Yet, discrepancies in the total number

of assignments do not necessarily equate to discrepancies in take-home pay due

to the varying levels of value and complexity associated with different appraisal

assignments.[2]  Thus, Davis earned more in commissions than Saumweber in May

and August even though he completed fewer appraisals.  (Id.; Doc. 26 (Nicholson

Decl. ¶ 15).)  Saumweber earned only $3,438.53 more in commissions than Davis

for January through November.  (Doc. 26 (Nicholson Decl. ¶ 13; Doc. 27 at 24).)

---

[1] This member of the operations team did not have supervisory authority over
Davis.  (Doc. 26 (Nicholson Decl. ¶ 11).)
[2] Capacity is assigned in increments of 100, with each 100 representing a
standard assignment.  (Doc. 26 (Nicholson Decl. ¶ 6).)  A standard assignment
would reflect an uncomplicated single-family home.  (Id.) An assignment may be
more or less than 100 points based on the property and complexity.  (Id.)

As part of this litigation, both Nicholson and Vescera were deposed.

Nicholson had the following exchange during his deposition:

Q: CoreLogic's answer to Interrogatory Number 7 identifies the individuals on the Appraisal Management Team in December 20 [sic] as including Mike McKinney, Clay Vescera, you, and Tracy Sanderson. Were you ever on any kind of team with those three individuals?

A: I think the term "team" is not—I mean, there was no specific Appraisal Management Team that I'm aware of.

Q: Do you know why Ms. Bullocks would refer to an Appraisal Management Team in this email?

A: No.

Q: And do you know why CoreLogic would answer an interrogatory saying that you were on an Appraisal Management Team along with Mike McKinney, Clay Vescera, and Tracy Sanderson?

A: No.

Q: Did the four of you ever communicate for any purpose, I mean, at the same time, as part of a project or a team or a common objective or anything like that?

A: We are part of appraiser management.

Q: What does that mean?

A: We manage appraisers.

Q: Well, putting aside whatever Ms. Bullocks meant by "Appraisal Management Team" in this email, did she ever talk to you to try to understand the appraisal volumes and how the appraisal work is assigned?

17

A: Yes.

. . .

Q: In the next paragraph that begins "You mentioned," if you skip the first two sentences, Ms. Bullocks says, "In addition, the female peer that you referenced was a supervisor of an appraiser trainee.  As a result, she had an adjusted capacity to account for the trainee hours needed to meet licensure requirements."  Do you see those two sentences?

A: I do.

Q: Do you know where Ms. Bullocks got that information to put into this email?

A: I believe she got it from me.

(Doc. 33 at 23 (Nicholson Dep. at 52-53); Doc. 46-1 at 16 (Nicholson Dep. at 54)

(Defense counsel objections omitted).)

Vescera had the following exchange about the information in Bullocks'

email during his deposition:

Q: I'll continue reading Ms. Bullocks' email, pick up where I left off. "In addition, the female peer that you referenced was a supervisor of an appraiser trainee.  As a result, she had an adjusted capacity to account for the trainee hours needed to meet licensure requirements.  I didn't see that she was given more orders because of her age or gender, as you mentioned in our discussion on November 18, 2020."  Do you see where I just read?

A: Yes.

Q: Do you know where she got that information that she passed on to Mr. Davis?

A: No.

Q: In Defendant's answers to Plaintiff's Interrogatories, Interrogatory Number 8, it states that "Defendant states that Jeannette Bullocks wrote the December 18, 2020 email to John Davis, using information provided by Clay Vescera and Scott Nicholson."

.   .   .

Q: You see a little further up in this email, after the four numbered sentences, Ms. Bullocks makes reference to an Appraisal Management Team.  Do you see that?

A: Yes.

Q: Do you know who was on the Appraisal Management Team that's referenced there?

A: No.

Q: Defendant's answer to Interrogatory Number 7 says that the Appraisal Management Team in December 2020 included Mike McKinney, yourself, Scott Nicholson, and Tracy Sanderson.  Do you know who Mr. McKinney and Ms. Sanderson are?

A: Yes.

Q: And have you ever heard the term "Appraisal Management Team"?

A: Yes.

Q: Okay.  Do you know why you were included as a member of the Appraisal Management Team in the answer to Interrogatory Number 7 when you testified you weren't on the Appraisal Management Team?

A: Okay.  I believe that's a figure of speech, but I'm—I'm guessing that "Appraisal Management Team" was a figure of speech to succinctly state who was reached out to, but certainly I managed appraisers and Scott managed appraisers, and we would be part

of the Appraisal Management Team, but it appears to be a figure
of speech to me.

Q: Just to make sure I understand that, you're saying that there is no
formal Appraisal Management Team named within CoreLogic?

A: Yes.  Correct.

(Doc. 33 at 7-8 (Vescera Dep. at 21-23) (Defense counsel objections omitted).)

Other facts will be discussed as necessary.

## III.   DISCUSSION

Davis claims he was given decreased assignments and compensation and
ultimately constructively discharged based on his age.  (Compl. ¶¶ 26, 29.)   The
case is currently before the Court on Defendant CoreLogic's Motion for
Summary Judgment.  (Doc. 23.)  Oral argument was heard via Zoom on
November 1, 2022.

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most
favorable to the non-moving party, there is no genuine dispute as to any material
fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking
summary judgment bears the burden of showing that there is no disputed issue
of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

A party asserting a fact is disputed must cite to "particular parts of materials in the record." <u>Neylon v. BNSF Ry. Co.</u>, 968 F.3d 724, 730 (8th Cir. 2020) (quoting citing Fed. R. Civ. P. 56(c)(1)(A) and noting that plaintiff failed to cite evidence supporting his statement). "The nonmoving party's allegations must be supported by "sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." <u>Mann v. Yarnell</u>, 497 F.3d 822, 825 (8th Cir. 2007) (cleaned up) (quotation omitted).

In an age discrimination suit, liability depends on whether age "'actually motivated the employer's decision.' That is, the plaintiff's age must have 'actually played a role in the employer's decision-making process and had a determinative influence on the outcome.'" <u>Tatom v. Georgia-Pac. Corp.</u>, 228 F.3d 926, 930–31 (8th Cir. 2000) (cleaned up) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000)).

**B.     Davis's MHRA Age Discrimination Claim**

Under the MHRA, it is an unfair employment practice for an employer to discharge an employee because of his age.  Minn. Stat. § 363A.08, subd. 2(2).  "To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence."  Aulick v. Skybridge Ams., Inc., 860 F.3d 613, 620 (8th Cir. 2017) (citation omitted).  If a plaintiff offers circumstantial evidence of age discrimination, as he does here, the Court applies the McDonnell Douglas burden-shifting analysis.

> Under McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff succeeds, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the employer meets this burden, then the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Id. (citations omitted).

> To establish his prima facie case, Davis must show:

> (1) he was a member of a protected group, i.e., at least 40 years of age, (2) he was qualified for his position, (3) that he was constructively discharged, and (4) he was replaced by a person not in the protected class, or similarly situated employees who were not members of the protected class were treated more favorably.

22

Tatom, 228 F.3d at 931 (citations omitted).  The burden of establishing a prima

facie case is not meant to be onerous.  Diesing v. Best Buy Corp., No. CIV. 05-

2540 MJD/RLE, 2007 WL 2601076, at *5 (D. Minn. Sept. 10, 2007) (citing Texas

Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

Davis must establish that age was the "but-for" cause of his constructive

discharge.  See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009).  The

ultimate question is whether CoreLogic "intentionally discriminated, and the

ultimate burden of proving intentional discrimination remains with" Davis.

Tatom, 228 F.3d at 931 (citations omitted).  "While no federal ADEA [("Age

Discrimination in Employment Act")] claim is made in this case, . . . claims

brought under the MHRA are generally considered under the same analytical

framework as federal ADEA claims."  Ace Elec. Contractors, Inc. v. Int'l Bhd. of

Elec. Workers, Loc. Union No. 292, AFL-CIO, 414 F.3d 896, 900 (8th Cir. 2005).

The Parties agree that Davis was in the protected class.  For purposes of

this motion, CoreLogic also concedes that Davis was qualified for his position as

a staff appraiser.  Although the Parties dispute whether Davis was replaced by a

younger employee, the Court need not resolve that issue because Davis has

failed to establish that he suffered an adverse employment action (i.e., that he

23

was constructively discharged after being given fewer appraisals because of his

age).  Therefore, summary judgment will be granted for CoreLogic.  See

Armstrong v. Mankato Area Pub. Sch., ISD No. 77, No. CIV. 12-2058 ADM/JSM,

2013 WL 3992431, at *3 (D. Minn. Aug. 5, 2013) (granting summary judgment for

defendant although "qualified" element was disputed because plaintiff failed to

show she was replaced by younger worker), aff'd, 555 F. App'x 644 (8th Cir.

2014).

### 1.    Adverse Employment Action (Constructive Discharge)

"An adverse employment action is defined as a tangible change in

working conditions that produces a material employment disadvantage,

including but not limited to, termination, cuts in pay or benefits, and changes

that affect an employee's future career prospects, as well as circumstances

amounting to a constructive discharge."  Jackman v. Fifth Jud. Dist. Dep't of

Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013).  Davis argues that he suffered an

adverse employment action by receiving fewer assignments than Saumweber,

which resulted in loss of income and constructive discharge.

Constructive discharge occurs when an "employer deliberately create[s]

intolerable working conditions with the intention of forcing" an employee to

24

quit.  Blake v. MJ Optical, Inc., 870 F.3d 820, 826 (8th Cir. 2017) (quotation

omitted).  To establish constructive discharge, a plaintiff must show that (1) a

reasonable person in his situation would find the working conditions intolerable,

and (2) the employer deliberately rendered the conditions intolerable so as to

force the employee to quit.  Tatom, 228 F.3d at 931-32.  Establishing a claim for

constructive discharge is a "substantial burden."  Blake, 870 F.3d at 826.

Under the first prong, "[t]he intolerability of working conditions is judged

by an objective standard, not by the employee's subjective feelings; the question

is whether working conditions were rendered so objectionable that a reasonable

person would have deemed resignation the only plausible alternative."  Tatom,

228 F.3d at 932 (citations omitted).  For example, "dissatisfaction with work

assignments[] and loss of pay are insufficient to constitute a constructive

discharge."  Id.  (citations omitted); see also Tidwell v. Meyer's Bakeries, Inc., 93

F.3d 490, 496 (8th Cir. 1996) ("Dissatisfaction with a work assignment is, as a

matter of law, normally not so intolerable as to be a basis for constructive

discharge.") (citation omitted).

A plaintiff may satisfy the second prong by showing his resignation was a

"reasonably foreseeable consequence of his employer's discriminatory actions."

Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 617 (8th Cir. 2007)

(cleaned up) (quoting Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281,

285 (8th Cir. 1993)).  "[P]laintiffs have a higher evidentiary burden to prove a

constructive discharge than an adverse employment action." AuBuchon v.

Geithner, 743 F.3d 638, 645 (8th Cir. 2014) (citation omitted).

### a)    Davis's Arguments

Davis argues that CoreLogic created a working environment that was

hostile to older workers because (1) CoreLogic terminated 18 appraisers in 2019,

"all of them older than [he] and Saumweber"; (2) McKinney asked Davis how

old he was and how long he planned to work; (3) Davis "suspected age was a

motivation in the assignment imbalance as evidenced by the fact he referenced

Saumweber's age when he complained to Bullocks"  (Doc. 42 at 19); and (4)

Saumweber would have no need for increased capacity after September 24 when

Rexford became a certified appraiser and was no longer a trainee (Id. at 12 (citing

Doc. 46 at 11 (Davis Dep. at 43 (Davis testifying that he knew Rexford did

appraisals up until June 2020 and then again in December and that the reason he

thought CoreLogic wanted to "push him out" was that Saumweber was younger

and "the business has become very much and old  . . . white guy business; and so

26

there's a strong interest amongst all appraisal firms to get younger people to replace the people who are retiring").)

For support, Davis cites <u>Ryther v. KARE 11</u>, a case in which the Eighth Circuit affirmed a jury decision finding that a former television sports anchor was not offered a contract renewal because of intentional age discrimination.  108 F.3d 832, 847 (8th Cir. 1997) (en banc).  In <u>Ryther</u>, the court found that the television station's actions "'conformed to a general pattern of discrimination' against older employees" when the plaintiff was criticized for having bags under his eyes; station employees called the plaintiff "old fart," "old man," "too old to be on the air," and stated that he "had no business being in the industry any more at his age"; and older employees were suddenly given poor performance reviews when management changed and were given the choice between early retirement and demotions, among other things.  <u>Id.</u> at 842.

Davis argues that CoreLogic's "shifting and contradictory versions of what occurred have no credibility and would lead a fact finder to the inescapable conclusion that [CoreLogic] deliberately adjusted Saumweber's capacity setting" to force Davis to quit, leaving two younger appraisers.  (Doc. 42 at 21.)  He notes

CoreLogic does not rebut his claim that he and his wife could not "financially

endure another month with insufficient work to earn a commission." (Id.)

Davis also argues that because he began complaining about low work

volume to McKinney and senior manager Clay Vescera in September and

"repeatedly complained to McKinney about the low number of assignments, "it

would have been obvious for McKinney to check . . . capacity settings but he did

not until instructed to do so by Nicholson on November 18." (Id. at 9, 13, 22.)

Davis asserts that McKinney is culpable because he "was responsible for making

adjustments to capacity within Defendant's system." (Id. at 13.) Davis also

relied on Vescera's statements that it would be "scary" to not have an assignment

for two weeks and that he would conduct a "deep dive." (Id. at 22.)

He argues that Vescera and Nicholson's contradictory testimony regarding

whether the appraiser management team even existed and what occurred during

the investigation of Davis's complaint supports his theory that someone,

probably McKinney, decided to push him out of CoreLogic. (Id. at 8-12.)

Davis asserts that since the assignment imbalance was not corrected by

Vescera or McKinney, he had no choice but to look for other work. However, he

states that his complaint to Bullocks shows that he would have preferred to stay

employed by CoreLogic.  (<u>Id.</u> at 22.)  Thus, Davis now asserts that CoreLogic

falsely states that he decided to quit "well before November 2020" and that he

"voluntarily resigned."  (<u>Id.</u> at 16.)   Davis avers that when Bullocks told him that

the investigation would not be completed for two weeks, Davis felt he had no

choice but to accept other employment, especially since he suspected that the

assignment imbalance was deliberate and was motivated by CoreLogic's "goal of

eliminating him in favor of two younger appraisers."  (<u>Id.</u> at 22.)

Davis argues,

His suspicions were more than borne out by the fact that, when
Bullocks told him the investigation would take over two weeks,
Saumweber's capacity setting had already been adjusted so that she
and Plaintiff would have received an equal number of assignments
after that.  There is simply no credible explanation for why neither
McKinney, who made the capacity adjustment himself on November
18, 2020, or anyone else involved in the investigation told Plaintiff of
the adjustment to Saumweber's capacity setting.  No one told him
because Defendant had achieved its objective—forcing Plaintiff to
resign.  Defendant had months to correct Saumweber's capacity
setting but intentionally failed to do so in order to force Plaintiff to
quit and to achieve its objective motivated by age discrimination.

(<u>Id.</u> at 22-23.)

29

b)      **Analysis**

i.      **Discriminatory Atmosphere**

Although the burden of establishing a prima facie case is not meant to be onerous, <u>Diesing</u>, 2007 WL 2601076, at *5, Davis has failed to do so here.  Looking at the facts in the light most favorable to Davis, his assertion that CoreLogic supported a working environment hostile to older employees is unsupported by the record.  Davis testified that he did not "think" any of the appraisers let go in 2019 were younger than he is but admitted that he "wouldn't know for certain." (Doc. 31 at 7 (Davis Dep. at 49).)  In fact, Davis testified, "Well, I guess I knew because they didn't have the work for them, I suppose. . . . I think they lost the largest supplier of work at the time, Wells Fargo. . . . So I would assume that's [why they were let go]."  (<u>Id.</u> (Davis Dep. at 48-49).)  Therefore, Davis has not established that age was the factor in determining who was let go in the RIF.

In addition, while McKinney once asked Davis how old he was and how long he planned to work as an appraiser, this did not concern Davis, who said that no CoreLogic manager ever said anything discriminatory to him.  (Doc. 31 at 6 (Davis Dep. at 44-45).)  McKinney asked him this during a lunch in 2019 before McKinney most recently again became Davis's manager.  (<u>Id.</u>)  Davis did not

think McKinney was trying to push him out or was responsible for the assignment imbalances that led him to resign.  (Id. at 21 (Davis Dep. at 156-57).)

This lack of evidence of discriminatory intent and atmosphere distinguishes the instant situation from the situation in Ryther in which the entire working atmosphere was imbued with remarks and actions aimed at discriminating against older employees.  108 F.3d at 842.  Furthermore, although McKinney was Davis's manager in 2019 when he asked Davis how long he wanted to be an appraiser, after Davis tendered his resignation, McKinney left Davis voicemails that indicated McKinney was upset Davis was leaving.  (Doc. 31 at 21 (Davis Dep. at 155-56).)

Even assuming a question about how long someone wants to hold a certain position within a company is a question about retirement, it is not discriminatory for a supervisor to ask about a person's possible retirement plans in a profession that is, as Davis stated in his deposition, dominated by people nearing retirement and in need of succession planning due to upcoming retirements.  See Naguib v. Trimark Hotel Corp., No. 15-CV-3966 (JNE/SER), 2017 WL 598760, at *11 (D. Minn. Feb. 14, 2017) (finding "occasional inquiries about retirement plans" insufficient to show discriminatory animus) (citing Cox

v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998)), aff'd, 903 F.3d

806 (8th Cir. 2018)); Barket v. NextiraOne, 72 Fed. App'x. 508, 510 (8th Cir. 2003)

(supervisor's four statements about retirement merely reflected "the very real

fact that Barket was approaching retirement age").  Moreover, none of the

appraisal imbalances occurred near the time McKinney made that comment.

Therefore, Davis cannot demonstrate a causal relationship between the comment

and the appraisal imbalances or his resignation.  See Naguib, 2017 WL 598760, at

*11 (finding that plaintiff failed to provide evidence of link between discharge

and certain comments); Carraher v. Target Corp., 503 F.3d 714, 718 (8th Cir. 2007)

(stating that courts consider "the time gap between when the statements were

made and the date of termination" when deciding if causal relationship exists

between certain statements and termination) (cleaned up and citation omitted).

In addition, younger employees also experienced low workloads and

commission payments, which led to both Saumweber and Rexford quitting

within a year of Davis resigning.

### ii.    Constructive Discharge

Turning to constructive discharge, Davis's arguments are grounded in

speculation.  Davis cites no evidence in the record other than that he "thought

that McKinney may have created the assignment imbalance intentionally." (Doc. 42 at 16 (emphasis added) (citing Doc. 46 at 18 (Davis Dep. at 129).) First, there is no evidence that anyone "created the assignment imbalance intentionally."

Second, McKinney was not even Davis's manager in April 2020 when the capacity error occurred or in July 2020, the month when the biggest discrepancy occurred. (See Doc. 27 at 24 (chart comparing number of appraisals Davis and Saumweber completed each month in 2020; in July, Saumweber completed 29 and Davis completed 9).) To the extent Davis argues that the capacity imbalance began only after McKinney became his manager in August 2020, the facts prove the capacity reset was done in April, months before McKinney became manager and that the biggest discrepancy in appraisal assignments occurred in July, a month prior to McKinney becoming Davis's manager.[3] Thus, Davis's argument that McKinney might somehow be responsible is not only speculative, but also improbable. Importantly, this argument is at odds with Davis's deposition

---

[3] Davis includes his own chart showing different case assignment numbers, stating the numbers are "based on a spreadsheet produced by Defendant showing assignments to Saumweber and Plaintiff in 2020." (Doc. 42 at 11.) Davis did not provide a citation for "the spreadsheet" or provide it for the Court's inspection. Accordingly, there is no foundation for the chart and the Court has not relied on the information contained in it.

testimony that he did not think McKinney was responsible for the assignment

imbalances that led to his resignation.  (Doc. 31 at 21 (Davis Dep. at 157).)  Third,

McKinney is older than Davis.  (Doc. 29 (Bullocks Decl. ¶ 7) (stating that

McKinney was age 58 in November 2020).)  Therefore, even if McKinney was

involved in any decision-making around assigning appraisals in 2020, something

there is no evidence to support, that McKinney was older than Davis undercuts

Davis's discrimination argument unless Davis can create an issue of material fact

that the assignments were made in a discriminatory fashion, which he cannot.

See Askari v. L.A. Fitness Int'l., No. 09-cv-2789 (ADM/JSM), 2010 WL 3938320, at

*5 (D. Minn. Oct. 5, 2010) ("[A]lthough members of a protected class may

sometimes discriminate against other members in that class, a plaintiff faces a

difficult burden of establishing discrimination when the decision-maker is a

member of the same protected class as the plaintiff.") (citation omitted).

Furthermore, the only ways Davis claims to have alerted anyone at

CoreLogic to the imbalance issues are by informing Vescera about the issue via

email on September 25 and by "constantly" discussing the issue with McKinney.

However, Davis did not report a capacity imbalance to Vescera.  He only

reported a general "lack of work and new business generation," "lack of

34

workflow," and "client generation." (Doc. 36 at 70.) Although Davis stated he had not had any orders in two weeks (which was not true), he said it was a problem for "every former District 7 appraiser" and "many" appraisers. (Id.) Thus, this email failed to establish an adverse employment action because it did not mention discrimination. Nothing in the email states Davis is experiencing anything different from the other appraisers in "District 7." In this email, Davis also speculated as to the reason for the loss of work—the loss of two clients and less work from another client, not discrimination. (Id.)

Moreover, Davis admitted that he never talked to McKinney about getting fewer assignments than Saumweber despite stating that he "constantly" discussed his low commissions with him. (Doc. 31 at 17 (Davis Dep. at 129); Doc. 46 at 8-9 (Davis Dep. at 40-41).) Davis also never asked McKinney to fix the commissions situation, only stated that McKinney was aware that he was not getting work for "large chunks of time." (Doc. 46 at 9 (Davis Dep. at 41).)

Despite this, Davis thinks it should have been "obvious" for McKinney to check the capacity settings based on their discussions about the low appraisal numbers. However, since there was a general downturn in the industry and

35

Davis never mentioned an imbalance between himself and anyone else, capacity was not an obvious place to check to generate higher appraisal numbers.

The Court finds that the imbalance in assignments was a result of a clerical error and not an attempt to constructively discharge Davis. Saumweber's capacity was increased in April, should have been readjusted immediately, and unfortunately was not readjusted until November 18. Although at that time the reason for the capacity imbalance was presumed to be something other than what it really was, the reason was never discriminatory. See Tatom, 228 F.3d at 931 (plaintiff bears the burden to prove defendant intentionally discriminated).

While Davis argues that CoreLogic's changed explanations for the capacity imbalance lead to the "inescapable conclusion" that CoreLogic set Saumweber's capacity higher in order to force Davis to quit, there is no evidence this change was anything other than Nicholson's discovery during deposition preparation. Nicholson admits he made an educated guess about the capacity imbalance in November 2020 because he did not conduct a full forensic review at that time. (Doc. 33 at 21 (Nicholson Dep. at 42-43).) That explanation indicates a desire to save time and resources after Davis's departure, not discriminatory intent.

Davis also asserts that despite CoreLogic's original explanation for the imbalance in appraisal assignments, Saumweber would have had no need for increased capacity after September 24 when Rexford became certified. This is true and aligns with CoreLogic's original explanation: the original capacity change was made because Saumweber was supervising a trainee and Nicholson assumed that towards the end of Rexford's training period he was able to help with more appraisals and "even do the majority of some appraisals. So in order to get them some work, it was logical to assume that they had to have a slightly higher capacity in order to do that." (Id. at 18 (Nicholson Dep. at 29).) Saumweber was not supervising Rexford in November and her capacity was adjusted when the imbalance was discovered. (Id. at 17 (Nicholson Dep. at 23).)

In addition, although Davis makes much of the fact that no one at CoreLogic told him that McKinney changed Saumweber's capacity settings, Davis did not give CoreLogic time to do so. Although Nicholson had McKinney make the change on November 18, there is no indication Bullocks knew of the change. Bullocks planned to report the results of the deep dive in December. Davis quit the day after being informed how long the investigation would take. He never said he was dissatisfied with Bullocks' proposed timeline.

CoreLogic acted promptly—practically immediately—to address Davis's concerns. Davis, on the other hand, did not act reasonably when he quit the day after being told CoreLogic was investigating. Davis "had an obligation not to jump to the conclusion that [Bullocks'] attempt would not work and that [his] only reasonable option was to resign." Ames v. Nationwide Mut. Ins. Co., 760 F.3d 763, 769 (8th Cir. 2014).

Although Davis claims that Bullocks' email made it clear that "nothing was going to be done soon to correct the issue" (Doc. 42 at 15), nothing in the email supports this claim. The timeline did not create conditions so intolerable that a reasonable employee would feel compelled to resign. In addition, Davis's personal financial circumstances do not constitute grounds for a claim of constructive discharge. See Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990) (holding that plaintiff's belief he could not accept job because of financial considerations did not constitute "intolerable working conditions").

Moreover, there is nothing in Davis's complaint to Bullocks that indicates he would prefer to stay employed at CoreLogic. There is no record of the Zoom call between Bullocks and Davis other than Bullocks' summary of Davis's concerns, which states that Davis requested a voluntary layoff during the call.

38

Davis did not correct this statement when he responded to Bullocks' email.

While Davis now states that he did not request a layoff, but rather that he felt he

was slated for layoff, he also admits that Bullocks did not say he was slated for a

RIF. (Doc. 31 at 18 (Davis Dep. at 133).) Davis's argument is unsupported and

therefore without merit. See Mann, 497 F.3d at 825 (nonmoving party's

allegations must be supported by "sufficient probative evidence" rather than

"mere speculation, conjecture, or fantasy").

Finally, Davis claims that Nicholson's testimony related to the deep dive

into the imbalance issue is "completely at odds" with Nicholson's testimony.

Davis's arguments are without merit.

Davis's assertion that the two men disagree as to whether the appraisal

management team Bullocks referred to in her email even exists is a red herring.

Their deposition testimony is consistent that there was no group given the title of

"team" but that they both managed appraisers and both knew the other

members of the "team"; Vescera succinctly stated that the term was probably

being used as a "figure of speech." (Doc. 33 at 7-8 (Vescera Dep. at 21-23), 23

(Nicholson Dep. at 52-53); Doc. 46-1 at 15 (Nicholson Dep. at 52).) While

Nicholson testified there was "no specific Appraisal Management Team" that he

was aware of, he acknowledged that all people on the "team" were "part of appraiser management" who "appraise managers" and that Bullocks had spoken to him to try and understand the appraisal volumes and how appraisal work is assigned. (Doc. 33 at 23 (Nicholson Dep. at 51-53).) Thus, Nicholson's testimony is not the outright contradiction that Davis tries to portray.

Likewise, Davis's argument that the two men did not agree on what happened during the investigation is also baseless. Davis asserts that Vescera stated that he completed the deep dive into Davis's allegations with Nicholson but that Nicholson does not recall that. (Doc. 42 at 8.) These two statements are not at odds. Nicholson merely stated that he did not remember whether he worked on the issue alone or if he and Vescera worked on it together. (Doc. 33 at 17 (Nicholson Dep. at 24).) Faulty memory on this point does not create an issue of material fact. Davis's notation that Vescera testified that he and Nicholson reviewed the profile, found the issue, and fixed it is not contrary to Nicholson's testimony that he found the problem on November 18 and had McKinney fix the issue that day. (Id. at 6 (Vescera Dep. at 14-16).) In fact, Vescera stated that once the problem was identified, "Scott [Nicholson] took over from there," which is in concert with Nicholson's testimony that once the problem was found <u>he</u>

contacted McKinney to change Saumweber's capacity settings. (Id. at 6 (Vescera Dep. at 15), 17 (Nicholson Dep. at 23).) This is also in concert with Nicholson's testimony that he thinks Bullocks got the information for her December 18 email from him (since he was the last person working on the issue and thus a likely person to report the resolution) while Vescera testified that he did not know where the information came from. (Doc. 46-1 at 16 (Nicholson Dep. at 54).) To that end, Bullocks had assigned the capacity issue to both Vescera and Nicholson, so it was reasonable for her to assume that any report she received from was provided on behalf of both men, which explains why CoreLogic's answer to Plaintiff's Interrogatory No. 8 states that the information Bullocks used in her December 18 email to Davis was provided by Vescera and Nicholson.

Finally, Davis argues "that weeks elapsed between when Bullocks asked him to complete the deep dive with Nicholson and when he and Nicholson identified the problem," which is at odds with Nicholson's testimony that the deep dive was conducted on November 18 and that McKinney was instructed to change Saumweber's capacity setting the same day. (Doc. 42 at 8-9 (citing Doc. 33 at 9 (Vescera Dep. at 27), 17 (Nicholson Dep. at 23) (emphasis in original).) The relevant portion of Vescera's deposition follows:

Q: Do you know approximately how much time elapsed between when Ms. Bullocks asked you to do the deep dive that you ultimately did with Mr. Nicholson and when you and Mr. Nicholson identified the problem that you've identified?

A: No.

Q: Can you say whether it was days, weeks, months?

A: Certainly weeks.

(Doc. 33 at 9 (Vescera Dep. at 27) (Defense counsel objection omitted).)

While this statement is at odds with other evidence in the record, it likely represents a misunderstanding: weeks certainly elapsed between when Vescera told Davis he would do a deep dive and when he did it at Bullocks' prompting. However, even if it was true that weeks elapsed from November 18 when Bullocks told Vescera and Nicholson to do the deep dive to when the two men found the capacity imbalance, that does not create an issue of material fact that overcomes summary judgment because there is no evidence that any delay was motivated by age discrimination. It is still obvious the capacity issue was found at least on or before December 18 when Bullocks explained the results of the deep dive to Davis. (Doc. 36 at 73.) If anything, if the Court operated under these facts, one of Davis's arguments would be moot: his argument that "there is

simply no credible explanation" for no one telling him that Saumweber's capacity was changed on November 18. If the deep dive took weeks, then the capacity imbalance would not have been found until shortly or immediately before Bullocks contacted Davis on December 18, and no one "withheld information" from Davis.

As it is, the Court finds that the capacity imbalance was found on November 18 and Davis was not notified until December 18. However, since Bullocks did not intend to report back to Davis until December, this lack of immediate communication was not a sign of discrimination. Davis voluntarily resigned before Bullocks had the opportunity to communicate with him.

Davis has not satisfied either element of a constructive discharge claim. He has presented no evidence of (1) an imbalance of appraisal assignments at CoreLogic such that a reasonable person in his situation would find the working conditions intolerable or (2) that CoreLogic deliberately rendered the conditions intolerable so as to force him to quit. Tatom, 228 F.3d at 931-32. In short, Davis has not established that age was the but-for cause of his alleged constructive discharge. See Gross, 557 U.S. at 177. Accordingly, Davis has not established a prima facie case of age discrimination.

### 2. Legitimate, Nondiscriminatory Reason for Capacity Imbalance

Even assuming Davis had established a prima facie case, the burden would then shift to CoreLogic to articulate a legitimate, nondiscriminatory reason for the capacity imbalance. <u>Canning v. Creighton Univ.</u>, 995 F.3d 603, 611 (8th Cir.), <u>cert. denied</u>, 142 S. Ct. 585 (2021). Although a defendant's explanation must be clear and reasonably specific, "this burden is not onerous and does not require proof by a preponderance of the evidence." <u>Id.</u>

CoreLogic maintains that the workload imbalance between Davis and Saumweber was the result of an inadvertent error: Saumweber's capacity was mistakenly not readjusted after the April 2020 adjustment. The Court finds this explanation believable in light of all evidence in the record. "Inadvertent mistake is a legitimate, nondiscriminatory reason for an employment action." <u>Perkins v. Funny Bone Comedy Club of Omaha, Inc.</u>, No. 8:06CV44, 2007 WL 1362854, at *7 (D. Neb. Apr. 18, 2007); <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 586 (6th Cir. 2009) ("Courts have held that an employer's explanation of an admitted mistake . . . constitutes a legitimate nondiscriminatory reason.") (gathering cases); <u>Johnson v. AT & T Corp.</u>, 422 F.3d 756, 762 (8th Cir. 2005) (holding that the proper inquiry is not whether an employer is correct in

determining an employee violated policy but whether an employer honestly

believes an employee violated policy).

### 3.   Pretext

Since CoreLogic has offered a legitimate, non-discriminatory reason for the

capacity imbalance, Davis must now prove that CoreLogic's reason was merely

pretext for intentional discrimination.  Canning, 995 F.3d at 611.  Davis's burden

to prove pretext "requires more substantial evidence than it takes to make a

prima facie case and evidence of pretext . . . is viewed in light of the employer's

justification."  King v. Guardian ad Litem Bd., 39 F.4th 979, 987 (8th Cir. 2022)

(cleaned up).  To prove pretext, Davis must both discredit CoreLogic's stated

reason for the assignment imbalance and show that circumstances permit

"drawing a reasonable inference" that the reason for the assignment imbalance

was discrimination.  Id.  To survive summary judgment, Davis must identify the

evidence he believes demonstrates pretext.  See Reeves, 530 U.S. at 143, 148; Kiel

v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999).

Davis does not identify evidence he believes demonstrates pretext.  He

instead relies on his prima facie case, arguing that he has "produced sufficient

evidence for a jury to conclude that the reasons given for the assignment

imbalance were a pretext, or a cover-up, for the real, unlawful reasons."  (Doc. 42

at 21 (citing, inter alia, Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940,

946 (8th Cir. 1994) (stating that at pretext stage of a Title VII action, "the standard

for plaintiff to survive summary judgment required only that plaintiff adduce

enough admissible evidence to raise genuine doubt as to the legitimacy of the

defendant's motive, even if that evidence did not directly contradict or disprove

defendant's articulated reasons for its actions"); Hoover v. Norwest Priv. Mortg.

Banking, 632 N.W.2d 534, 546 (Minn. 2001) ("In some cases, sufficient evidence

may consist of only the plaintiff's prima facie case plus evidence that the

employer's proffered reason for its action is untrue.")).  Thus, Davis argues that

he has produced enough evidence to allow his claims to go to a jury.  (Id.)

> Although it is possible for strong evidence of a prima facie case to
> also present a factual issue on pretext, the ultimate question is
> whether the plaintiff presents evidence of conduct or statements by
> persons involved in the employer's decision-making process
> reflective of a discriminatory attitude sufficient to allow a reasonable
> jury to infer that that attitude was a motivating factor in the
> employer's decision to fire the plaintiff.

Kiel, 169 F.3d at 1135 (citations omitted).

The Court finds that no evidence Davis presented raised a genuine issue of

material fact as to CoreLogic's intentions.  There is no evidence that CoreLogic

said or did anything that was a pretext for intentional discrimination.  CoreLogic

investigated as soon as Davis mentioned assignment imbalance.  Changes to

Saumweber's capacity were made the day the imbalance was discovered.  While

the changes were not communicated to Davis that day, Bullocks intended to

provide Davis a report at a later time that included the findings from the deep

dive.  And, as previously noted, there is no indication that Bullocks even knew

about the capacity change on November 18.

While CoreLogic provided two explanations for the capacity imbalance,

the explanations were consistent and non-discriminatory.  Evidence of a

"substantial shift" in an employer's explanation for an employment decision can

provide evidence of pretext but a mere "elaboration generally is not."  Phillips v.

Mathews, 547 F.3d 905, 913 (8th Cir. 2008) (concluding that the reference to "an

additional aspect of the same behavior" that led to the adverse employment

action did not constitute "a substantial change in [the employer's] story, and

[was] not probative of pretext").  Here, CoreLogic's two reasons were both

aspects of the same explanation: an error was the cause of the capacity

imbalance.  That CoreLogic was incorrect in its first assessment does not

undermine its credibility:

> [T]he proper inquiry is not whether AT & T was factually correct in
> determining that Johnson had made the bomb threats. Rather, the

> proper inquiry is whether AT & T honestly believed that Johnson
> had made the bomb threats. . . . We have recognized that the
> showing of pretext necessary to survive summary judgment requires
> more than merely discrediting an employer's asserted reasoning for
> terminating an employee. Johnson is also required to show that the
> circumstances permit a reasonable inference to be drawn that the
> real reason AT & T terminated him was [discriminatory].

Johnson, 422 F.3d at 762–63.  As previously discussed, CoreLogic believed

everything it communicated to Davis when it communicated it, even though it

was mistaken.  Davis has not shown that any circumstances permit a reasonable

inference that CoreLogic purposely manipulated Saumweber's capacity so as to

force Davis to resign, much less that age "played a role in [CoreLogic's] decision-

making process and had a determinative influence on the outcome."  Tatom, 228

F.3d at 930–31.

## IV.    ORDER

Based upon the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that Defendant's Motion for Summary Judgment **(Doc. 23)** is

**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  March 27, 2023                         s/Michael J. Davis
                                               Michael J. Davis
                                               United States District Court